CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/20/2017

JULIA C. DUDLEY, CLERK
BY: s/ JODY TURNER
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| ANGELA CALLOWAY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:16-cv-00081 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| COMMONWEALTH OF VIRGINIA, *et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

The claims in this case arise from an incident in which plaintiff Angela Calloway was strip-searched during the course of visiting an inmate at the Augusta Corrections Center (ACC), a facility run by the Virginia Department of Corrections (VDOC). Calloway's complaint names as defendants the Commonwealth of Virginia, the Warden of the ACC (defendant Woodson), four male employees of ACC who interacted with her on that date (defendants Brown, Hoskie, Lokey, and Shires),[1] and two Jane Does, who are the unidentified female officers who conducted the actual search. All of the defendants are named as to all of the "causes of action" set forth in the complaint.

In addition to five state law tort claims, she also brings two claims under 42 U.S.C. § 1983, alleging that the illegal search violated her Fourth and Fourteenth Amendment rights under the United States Constitution and that defendants violated her due process rights under the Fifth and Fourteenth Amendments. Additionally, she brings corresponding claims under

---

[1] Originally, the complaint named Randolph Hoskie, but Edward O. Hoskie has since been identified as the officer involved and has been substituted for Randolph. (Order, Dkt. No. 30.)

Article 1, Sections 10 and 11 of the Virginia Constitution, and a claim that the strip search violated Virginia Code § 19.2-59.1.

Pending before the court is defendants' motion to dismiss, brought on behalf of all the named defendants, which seeks dismissal of Calloway's entire complaint on various grounds. The motion has been fully briefed and was argued before the court. For the reasons set forth herein, the court will grant the motion in part and deny the motion in part.

## I.  BACKGROUND

The facts recited in this section and relied on below are taken from the complaint. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). For purposes of the motion to dismiss, the court accepts the complaint's well-pleaded factual allegations as true and construes them in the light most favorable to Calloway. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010).

Prior to the incident at issue, Calloway had applied to attend visitation at the ACC and her application was approved. As part of that application process, she was required to pass a criminal record background check. Prior to the July 17, 2016 incident giving rise to this lawsuit, Calloway had participated in at least one prior authorized visit with an inmate at ACC without incident.

Upon her arrival on July 17, 2016, she was required to show her driver's license for identification. After officers confirmed that she was on the approved visitor list, Calloway submitted to several security screening measures, including placing her jacket and shoes in a container for inspection, going through a metal detector, and undergoing an entire body "pat down" by a female officer for weapons or contraband. She was ultimately permitted to enter the visitation room and was directed to a table. The inmate she was there to visit arrived a few minutes later and sat at the same table across from Calloway. (Compl. ¶¶ 21–40, Dkt. No. 1.)

For some period of time, Calloway and the inmate were permitted to visit. At approximately 1:30 p.m., visitation was paused so officers could conduct an inmate count, and then the visitation resumed. Approximately 20 to 30 minutes later, "suddenly and without warning four corrections officers surrounded the table at which [Calloway] and the inmate were visiting, and two of the officers quickly removed the inmate from the visitation room." (Compl. ¶ 42.) Defendants Lokey and Brown then ordered Calloway to stand up, and they escorted her out of the visitation room and into another room. Lokey informed Calloway that she had been observed on camera trying to unbutton her pants and that this was the reason she had been removed from the visitation room. He further explained that sometimes people bring drugs into the ACC, so the officers must be very cautious. (*Id.* ¶¶ 43–46.)

Calloway denied the accusation, said she did not have drugs, and told the officers that she would not have brought drugs to the ACC. She asked to view the video to which Lokey had referred, but that request was denied. Instead, Calloway was given the choice of either submitting to a strip search or being banned from all future visits to ACC. Defendants further advised Calloway that, even if she did consent to the search, she would not be permitted to return to the visitation that day and that she would have to go home. (*Id.* ¶¶ 47–55.)

Calloway was confused and frightened by what she was told and "understood from their instructions that she had no choice but to submit to the search, and that she was in jeopardy of being hurt, detained, arrested[,] or refused all future visitation if she declined to consent to the search." (*Id.* ¶ 54.) Lokey gave her a consent form, and he told her to read it over and sign it. Calloway was upset and crying, but she "tried her best to stay calm, and to read the consent form." (*Id.* ¶¶ 55–57.) She completed the form, signed it, and dated it. (*Id.* ¶ 58.)

A few moments later, two female corrections officers entered the room and directed Calloway to another, smaller room where they stated she would be searched. Ultimately, they

escorted her to a public restroom, where she was subjected to an invasive search. During the search, the deputies required Calloway to disrobe until naked and to remove a tampon from her body. The deputies conducted both a visual inspection and touched her body and hair. Calloway was also required to touch her own body, including lifting her breasts and using her hands to spread her buttocks so they could see that she was not concealing contraband. She also was required to squat and cough while naked two times. No contraband was found, and she was permitted to dress and to continue her visit. (*Id.* ¶¶ 60–83.)

Several correctional officers, including defendants Hoskie and Shires, "seemed apologetic" to Calloway afterward. (*Id.* ¶ 84.) For example, Hoskie said to Calloway, "Sometimes when people think they see something but they didn't really see something, they still make their own assumption of it, that is what happened here, and that's how this all came about." (*Id.* ¶ 85.) Hoskie and Shires advised that the warden was not at the center that day but told Calloway that if she wanted to contact someone about the incident, she should call the warden the following week. Hoskie also asked Calloway to put in a good word for him with the warden, if she spoke to him, "since he had been so helpful"—a request Calloway found "bizarre." (*Id.* ¶¶ 88–89.) Although Calloway continued her visit until she was able to calm down, she has not visited the ACC since. (*Id.* ¶¶ 90–91.) She asserts that the defendants' decision to strip search her was made at a time when they were in possession of a video supporting her claims of innocence. She further alleges that defendants lacked reasonable suspicion to warrant/justify her detention and strip search.

Her complaint lists her claims as seven "causes of action," all of which are asserted against all seven defendants:

1. A claim under 42 U.S.C. § 1983 alleging a Fourth Amendment violation, based on the strip search;

2. A claim under 42 U.S.C. § 1983 alleging Fifth and Fourteenth Amendment due process violations, based on her being required to submit to the strip search without any proof of the accusation against her or any opportunity to confront the officer, and without informing her that she was free to leave the Center without answering their questions and without consenting;

3. "Violations of Virginia Constitution and State Law," a claim that references Article 1, Sections 10 and 11 of the Virginia Constitution and Va. Code § 19.2-59.1;

4. A negligence claim;

5. An assault claim;

6. A false imprisonment claim; and

7. An intentional infliction of emotional distress claim.

(*See generally* Compl.)

## II.  STANDARD OF REVIEW

As noted, defendants' motion to dismiss seeks the dismissal of all claims against them on various grounds, including sovereign immunity and qualified immunity.  The motion is filed under both Rule 12(b)(6) and 12(b)(1), for lack of jurisdiction.

A Rule 12(b)(6) motion tests the legal sufficiency of a plaintiff's complaint to determine whether the plaintiff has properly stated a claim.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  To avoid dismissal, the complaint must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In essence, the plaintiff must "nudge[] [her] claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding whether Calloway has met this plausibility standard, the court must take as true all well-pleaded facts in the complaint and in any documents attached and integral to it.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Further, the court must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244, but it need not "accept legal conclusions couched as

facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted).

A motion to dismiss under Rule 12(b)(1) tests the court's subject-matter jurisdiction over a plaintiff's claim. The plaintiff bears the burden of establishing that subject-matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In deciding a Rule 12(b)(1) motion to dismiss, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). It must, however, "view[] the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768).

## III.  DISCUSSION

### A.  The Claims Under the Virginia Constitution Are Subject to Dismissal.

The court first concludes that Calloway's claims brought pursuant to Article 1, Sections 10  and 11 of the Virginia Constitution are subject to dismissal. As explained in *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712 (E.D. Va. 2015), *reconsideration denied,* No. 1:15-cv-209, 2015 WL 12806530 (E.D. Va. Oct. 2, 2015):

> In order to enforce a private right of action under the Virginia Constitution, the provision in question must be self-executing. *See Robb v. Shockoe Slip Found.,* 228 Va. 678, 324 S.E.2d 674, 676 (1985). Although the due process provision of the Virginia Constitution[, *i.e.*, Article 1, Section 11,] is "self-executing," this has only been held to be true with regard to *property* deprivation. *See Gray v. Rhoads,* 55 Va. Cir. 362, 2001 WL 34037320, at *5

> (City of Charlottesville, 2001) (holding that the Due Process
> Clause of the Virginia Constitution is "self-executing, but only to
> the extent of deprivation of property" and collecting cases);
> *Graham v. Mitchell,* 529 F. Supp. 622, 625 (E.D. Va.1982)
> (holding that there is a "common law action" to enforce the
> Virginia constitutional due process provision as to property
> deprivations).

*Id.* at 728. The same principles apply to Calloway's Section 10 claim, which courts have also held is not self-executing. *See Botkin v. Fisher,* No. 5:08-cv-58, 2009 WL 790144, at *4 (W.D. Va. Mar. 25, 2009) (collecting authority that has "consistently held that Article I, § 10, pertaining to general warrants, is not self-executing"). This case does not involve the taking of property under Section 11, and Calloway cites no authority that would allow her to assert a cause of action under either Section 11 or Section 10 for the alleged state constitutional violations here. Accordingly, her state constitutional claims will be dismissed.

**B. Virginia Code § 19.2-59.1 Does Not Permit a Private Cause of Action.**

As part of her "third cause of action," which alleges violations of the Virginia constitution, Calloway also claims that the defendants' actions violated Virginia Code § 19.2-59.1. The primary subsection of that statute provides:

> A. No person in custodial arrest for a traffic infraction, Class 3 or
> Class 4 misdemeanor, or a violation of a city, county, or town
> ordinance, which is punishable by no more than thirty days in jail
> shall be strip searched unless there is reasonable cause to believe
> on the part of a law-enforcement officer authorizing the search that
> the individual is concealing a weapon. All strip searches conducted
> under this section shall be performed by persons of the same sex as
> the person arrested and on premises where the search cannot be
> observed by persons not physically conducting the search.

Va. Code § 19.2-59.1. The statute then goes on to set out other requirements regarding strip searches, such as requiring written policies, requiring that searches of body cavities be conducted by or under the supervision of medically trained personnel, and other subsections.

Even assuming that the provision is applicable in the context here and that the actions of defendants violated that provision, Calloway has not provided any authority to the court showing that the statute creates a private cause of action. As the Supreme Court of Virginia recently explained:

> A statutory right of action no doubt exists when a statute expressly authorizes it. There are dozens of examples of this in the Code of Virginia. When a statute is silent, however, we have no authority to infer a statutory private right of action without demonstrable evidence that the statutory scheme necessarily implies it. . . . The necessity for such an implication must be palpable. We would never infer a "private right of action" based solely on a bare allegation of a statutory violation.

*Cherrie v. Va. Health Servs., Inc.*, 787 S.E.2d 855, 858 (Va. 2016) (internal citations omitted).

So, the court does not believe that a violation of this statute gives rise to a separate, private cause of action, although any violation may be relevant to plaintiff's Fourth Amendment claim or to the defense of qualified immunity. *See Amaechi v. West*, 237 F.3d 356, 365 (4th Cir. 2001) (recognizing that Virginia Code § 19.2-59.1 may have some relevance to whether a defendant should know that a strip search was unconstitutional under clearly established law and is entitled to qualified immunity); *Burnham v. West*, 681 F. Supp. 1169, 1173 (E.D. Va. 1988) (explaining that a similar statute prohibiting warrantless searches "has been consistently held to provide only the same protection as that afforded by the Fourth Amendment").

The court's conclusion that no private right of action is permitted for a violation of § 19.2-59.1 is further supported by the fact that the statute immediately preceding this one—Virginia Code § 19.2-59, which places restrictions on warrantless searches—provides that "[a]ny officer or person violating the provisions of this section shall be liable to any person aggrieved

thereby in both compensatory and punitive damages." Va. Code § 19.2-59.  Section 19.2-59.1, by contrast, does not contain any such provision.[2]

Indeed, the court's own research has not revealed any case in which a separate cause of action was permitted for a violation of this statute.  Instead, Virginia courts (and federal courts) that have discussed the statute generally do so in the context of a criminal case or a § 1983 action.  *See, e.g.*, *Craddock v. Com.*, 580 S.E.2d 454, 461 n.2 (Va. Ct. App.  2003) (noting that the statute was inapplicable because the person was arrested for a felony and further explaining that there is no suppression remedy provided for a violation of the statute);  *Winston v. Com.*, 654 S.E.2d 340, 345 (Va. Ct. App. 2007) (same) (citing *Craddock*).

In the absence of any authority permitting a private cause of action under § 19.2-59.1 , the court declines to recognize one.  Thus, this claim, too, is dismissed.  Just as in *Amaechi,* though, the statute may have some relevance to the § 1983 claims and, in particular, to the defendants' assertion of qualified immunity as to the § 1983 claims.

## C.  The Virginia Tort Claims Act Claim Will Be Dismissed.[3]

Defendants argue that this court lacks subject matter jurisdiction to adjudicate Calloway's Virginia Tort Claims Act (VTCA) claim (and negligence claim) against the Commonwealth.

---

[2]  Furthermore, courts construing Section 19.2-59, which allows compensatory and punitive damages for a violation, have also held that the doctrine of sovereign immunity applies to claims under it.  In *Burnham*, for example, the court explained that "[o]nly the constitutional standard of conduct . . . should apply for purposes of determining sovereign immunity" and that, because the plaintiffs before it had not shown that the defendants knew or should have known that their searches would violate constitutional rights, or that the defendants acted with malicious intent, the actions were "simple negligence" and fell within the protections of sovereign immunity.  681 F. Supp. at 1174.  So, even if there were a private cause of action here, it likely would be subject to dismissal on sovereign immunity grounds.

[3]  Although it is not listed as a separate cause of action, Calloway references the VTCA in her complaint (Compl. ¶ 19), and her tort claims could only be asserted against the Commonwealth, albeit only in state court, if she complied with the notice requirements therein.

The court agrees.[4]  It is well established that the Eleventh Amendment generally bars suits

brought by a citizen against her own state.  *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d

91, 107 n.12 (4th Cir. 2011).  Thus, a "nonconsenting [s]tate[] may not be sued by private

individuals in federal court[,]" unless the sovereign has waived immunity.  *Bd. of Trs. of Univ.*

*Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

Calloway acknowledges these general principles, but she contends that the Eleventh

Amendment does not "automatically invalidate" her claim against the Commonwealth.  Instead,

she suggests that the "Commonwealth's receipt of federal funds for drug interdiction training and

residential substance abuse created an express waiver of its sovereign immunity" and asks the

court to take judicial notice of VDOC's receipt of federal funds.  This argument is unpersuasive.

While it is true that the acceptance of federal funds can lead to a finding that a state has

waived its sovereign immunity, that has been held to be true only where the federal statute places

clear conditions on the grant of those federal funds.  *See, e.g.*, *Constantine v. The Rectors &*

*Visitors of George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005) (holding that a state

university waived its Eleventh Amendment immunity under Section 504 of the Rehabilitation

Act by accepting federal funds under that statute, where the statute "clearly and unambiguously

conditioned receipt of such funds on a waiver of immunity").  Here, however, Calloway has not

pointed to any statute conditioning the receipt of funds on a waiver of immunity, nor identified

any express waiver of sovereign immunity tied to any federal funds given to VDOC.  Moreover,

---

[4]  Though "not a true limit on the subject-matter jurisdiction of federal courts, the Eleventh Amendment is a
block on the exercise of that jurisdiction." *Roach v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 74 F.3d 46, 48 (4th Cir.
1996) (quotation omitted).  District courts within the Fourth Circuit often consider this immunity defense under Rule
12(b)(1). *See, e.g.*, *McCants v. Nat'l Collegiate Athletic Ass'n*, No. 1:15-cv-176, 2017 WL 1507185, at *2
(M.D.N.C. Apr. 26, 2017); *Hutto v. S.C. Ret. Sys.*, 899 F. Supp. 2d 457, 466 (D.S.C. 2012); *Beckham v. Nat'l R.R.*
*Passenger Corp.*, 569 F. Supp. 2d 542, 547 (D. Md. 2008).

there would be a tenuous connection, at best, between funds given for drug interdiction and the torts at issue here. Accordingly, there has been no waiver of immunity shown.

The court further notes that, although the Commonwealth enacted the Virginia Tort Claims Act (VTCA) and allowed itself to be sued for negligence claims filed in state courts, it has not waived its Eleventh Amendment immunity and has not consented to be sued in *federal* courts. *McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987). This is true even where a claim like a VTCA claim would otherwise fall within the court's supplemental jurisdiction. *Creed v. Virginia*, 596 F. Supp. 2d 930, 938 (E.D. Va. 2009).

For all of these reasons, the court concludes that the Commonwealth is entitled to Eleventh Amendment immunity as to Calloway's VTCA claim and negligence claim. Furthermore, under the plain language of the VTCA, such claims may only be maintained against the Commonwealth, not against individual state officers. *See* Va. Code Ann. § 8.01-195.1. Accordingly, the VTCA claim and negligence claim are not viable against any of the individual defendants, either. The negligence claim and any separate VTCA claim will be dismissed in their entirety.

**D. The Commonwealth Is Entitled to Eleventh Amendment Immunity as to the § 1983 Claims, as Are the Individual Defendants in Their Official Capacities.**

The Commonwealth's Eleventh Amendment immunity, discussed with regard to the VTCA claim, applies with equal force to bar the § 1983 claims asserted against it. That is, with regard to the § 1983 claims, neither the state nor the individual state actors, sued in their official capacities, are considered a "person" subject to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). There is a limited exception, first set forth in *Ex parte Young*, 209 U.S. 123 (1908), which allows official capacity claims under § 1983 to be asserted against state

officials where a plaintiff seeks only prospective, injunctive relief. *Will*, 491 U.S. at 71 n.10 (recognizing exception); *see also Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995) (same). The court concludes that the *Young* exception, however, is not applicable here.

*Young* allows a plaintiff to maintain official-capacity claims for declaratory or prospective injunctive relief (as opposed to claims for damages) against state officials without offending the Eleventh Amendment. But this is true only where the plaintiff has sufficiently alleged "an ongoing violation of federal law and seeks relief properly characterized as prospective." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997). Here, Calloway has sought prospective declaratory and injunctive relief in her complaint, but the Supreme Court has cautioned against allowing that fact alone to control:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle, reaffirmed just last Term in *Seminole Tribe,* that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction. *See, e.g., Pennhurst* [*State School & Hosp. v. Halderman*, 465 U.S. 89, 102–103, 114 n.25] (explaining that the limitation in *Edelman v. Jordan,* 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974), of *Young* to prospective relief represented a refusal to apply the fiction in every conceivable circumstance).

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. at 270.

The Supreme Court's admonition is particularly salient as applied here because Calloway has not alleged any ongoing violation of federal law. The events alleged—if they violated federal law—are now indisputably over, and she has not plausibly alleged that they have re-occurred, are ongoing, or are likely to re-occur. Accordingly, the court will dismiss the § 1983

claims against the Commonwealth and against the officers in their official capacities due to Eleventh Amendment immunity.

**E.  Individual Defendants Are Entitled to Sovereign Immunity as to the State Claims for Negligence Brought Against Them.**

A state's immunity from suit also can extend to individual state actors or employees. *Messina v. Burden*, 321 S.E.2d 657, 661–62 (Va. 1984).  In general terms, sovereign immunity will shield state employees from liability for acts of simple, but not gross, negligence, where the acts are discretionary and not ministerial.  *Colby v. Boyden*, 400 S.E.2d 184, 186–87 (Va. 1991). In determining whether immunity extends to the defendants here, the court is guided by the factors set forth in *James v. Jane*, 282 S.E.2d 864 (Va. 1980), which asks the court to evaluate "(1) [t]he function the employee was performing; (2) [t]he state's interest and involvement in that function; (3) [w]hether the act performed by the employee involved the use of judgment and discretion; and (4) [t]he degree of control and direction exercised by the state over the employees."  *Pike v. Hagaman*, 787 S.E.2d 89, 92 (Va. 2016).

Calloway does not address in her response any application of the *James* factors and thus does not appear to dispute that application of the *James* factors would lead to a finding of sovereign immunity.  The court nonetheless discusses those factors briefly.  First of all, the function that the defendants were performing was a determination of whether or not what they observed on a video required the strip search of a visitor to the ACC.  Keeping the state's correctional facilities secure and safe is essential to a governmental objective and the government has a great interest and involvement in that function.  *See, e.g.*, *Jennings v. Hart*, 602 F. Supp. 2d 754, 759 (W.D. Va. 2009) (referencing that the state has a general interest in the safe and competent administration of its local correctional facilities).  The third and fourth factors also weigh in favor of finding sovereign immunity for the acts alleged here.  Defendants'

acts—which included determining whether there was a sufficient security risk to require a strip search—involved a high degree of discretion and judgment, and were not just ministerial in nature. Additionally, the state imposes a high degree of control over the conducting of strip searches at its jails, as evidenced by Virginia Code § 19.2-59.1, and state-wide VDOC policies govern at least a portion of the security screening that visitors must undergo in order to have inmate visits at VDOC facilities, as Calloway alleges. Thus, the court concludes that the individual defendants were engaged in discretionary acts and are entitled to sovereign immunity for alleged acts of simple negligence.

Accordingly, for the reasons discussed above, the individual defendants have sovereign immunity from suit as to the negligence claim against them. The court turns next to the intentional tort claims against the defendants.

The claims of assault, false arrest, and intentional infliction of emotional distress all involve allegations of intentional conduct. Thus, they fall outside the scope of sovereign immunity because they do not involve simple negligence. *Colby*, 400 S.E.2d at 186–87. So, the court next must consider the defendants' argument that the § 1983 claims are subject to dismissal on qualified immunity grounds and that the intentional tort claims are subject to dismissal for failure to state a claim.

## F. Defendants Have Not Shown That They Are Entitled to Qualified Immunity.

Turning to defendants' assertion of qualified immunity, this doctrine provides that government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). Such an official will be protected by qualified

immunity if his actions were objectively reasonable. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013). It is important to resolve the issue of qualified immunity "early in the proceedings" because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Qualified immunity generally involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that the defendants' conduct violated a constitutional right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201). If both prongs are satisfied, then qualified immunity does not apply. *Id.*

As to the first prong, the court concludes that the facts as alleged state a claim that the defendants' conduct violated a constitutional right. In relevant part, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . . against unreasonable searches and seizures." U.S. Const. amend. IV.

Unsurprisingly, strip searches—due to their invasive nature—have been the subject of many Fourth Amendment claims in various contexts. In the prison context, the Supreme Court held in *Bell v. Wolfish*, 441 U.S. 520 (1979), that officers must have some justification for a jail strip search under the Fourth Amendment. In *Bell*, the Supreme Court instructed courts faced with determining whether a jail strip search was unreasonable to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

Additionally, the Fourth Circuit has held, albeit in an unpublished decision, that in the absence of reasonable suspicion that a particular prison visitor is attempting to smuggle drugs or other contraband, a strip search of that prison visitor violates the Fourth Amendment. *United States v. Johnson*, 27 F.3d 564, at *2 (4th Cir. 1994) ("A reasonable suspicion standard applies to strip searches of prison visitors.") (unpublished table disposition). This is consistent with all other circuits to have considered the issue. *See O'Con v. Katavich*, No. 1:13-cv-1321, 2013 WL 6185212, at *5 (E.D. Cal. Nov. 26, 2013) ("Many other Courts of Appeals have concluded that, after weighing the state's legitimate interest in prison security against the privacy rights of prison visitors, a visitor may only be subjected to a strip search if the search is supported by reasonable suspicion. *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir. 1985); *Varrone v. Bilotti,* 123 F.3d 75 (2d Cir. 1997); *United States v. Johnson,* 27 F.3d 564 (4th Cir. 1994); *Spear v. Sowders,* 71 F.3d 626, 630 (6th Cir.1995) (en banc); *Burgess v. Lowery,* 201 F.3d 942 (7th Cir. 2000); *Thorne v. Jones,* 765 F.2d 1270, 1276–77 (5th Cir. 1985); *Boren v. Deland,* 958 F.2d 987 (10th Cir. 1992); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir. 1982) . . . .").

The Fourth Circuit has also applied that same standard to strip searches of jail employees or contractors. *Leverette v. Bell*, 247 F.3d 160, 168 (4th Cir. 2001) (concluding that the Fourth Amendment requires that prison authorities "possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person" before conducting a visual cavity search); *see also Vollette v. Watson*, 978 F. Supp. 2d 572, 579 (E.D. Va. 2013) (holding that a prison "standard strip search" of jail employees or contractors, requiring the person to remove all clothing and to "squat and cough" to expel contraband, must be supported at least by reasonable suspicion to comport with the Fourth Amendment).

Based on these authorities, it is plain that the allegations here state a constitutional violation. According to Calloway, she did not voluntarily consent to the search. She also did not

try to unbutton her pants, so no officer could have seen her trying to do so, and any video recording of her would have easily proven that fact. Defendants have not raised any other facts that would establish reasonable suspicion—or any suspicion at all—that Calloway was harboring drugs or other contraband. Under these facts, subjecting her to a strip search would violate the Fourth Amendment.

Turning to the second prong of the qualified immunity inquiry, a law enforcement officer is not expected to know all of the legal limits of well-known constitutional rights; the officer is entitled to immunity if a reasonable officer would not have understood that what he is doing violates the plaintiff's constitutional rights. *Anderson*, 483 U.S. at 638–39. As stated by the United States Supreme Court in *Malley*, "if officers of reasonable competence could disagree" on whether the action was reasonable, immunity should be granted. 475 U.S. at 341; *Springmen v. Williams*, 122 F.3d 211, 214 (4th Cir. 1997). Under this standard, all but the "plainly incompetent or those who knowingly violate the law" are protected. *Malley*, 475 U.S. at 341.

The Fourth Circuit has elaborated on the level of particularity that is necessary to deem a right "clearly established":

> "'[C]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir. 1992). The "contours of the right" must be drawn in such a way as to provide notice to a reasonable person in the official's position that his conduct violated the identified right. . . . Accordingly, we must determine whether the contours of the right to be free from an unreasonable search have been identified in such a way as to afford [the defendants] adequate notice that [their] search of the plaintiff transgressed the Fourth Amendment. In doing so, we look to "cases of controlling authority in [this] jurisdiction," as well as the "consensus of cases of persuasive authority" from other jurisdictions. *Wilson,* 526 U.S. at 617, 119 S. Ct. 1692.

*Amaechi v. West*, 237 F.3d 356, 362–63 (4th Cir. 2001) (internal citations omitted).

The authorities discussed above, including the Supreme Court's decision in *Bell* and the Fourth Circuit's decisions in *Johnson* and *Leverette*, all of which were decided before the events here in July 2016, show that it was "clearly established" at that time that defendants were required to have, if not "reasonable suspicion," then at least *some* reason justifying such a strip search of Calloway, a prison visitor. Given Calloway's allegations that there was no voluntary consent and no actions that could have given rise to a reasonable suspicion that she had done anything improper or illegal (and that the defendants possessed recorded evidence showing that), the court concludes that no reasonable officer could have believed that a strip search could be conducted under such circumstances.

Accordingly, at this stage of the case, the court cannot conclude that defendants are entitled to qualified immunity and will deny the motion to dismiss on this ground.

### G. Plaintiff Has Adequately Pleaded Claims for Assault, False Imprisonment, and Intentional Infliction of Emotional Distress.

The court addresses next whether the intentional tort claims are subject to dismissal because they fail to state a claim. The court discusses the elements of each claim first and then turns to defendants' arguments.

The common law tort of assault requires proof that the defendant: (1) engaged in an overt act intended to inflict bodily harm, coupled with the present ability to inflict such harm, or (2) "engages in actions intended to place the victim in fear of bodily harm," thereby creating "a well-founded fear in the victim." *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005).

In order to prove false imprisonment, Calloway must show that her liberty was restrained without any sufficient legal excuse. *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). The restraint need not be physical; it can be caused by threats as well as by actual force, and the threats may be by conduct or by words. *W.T. Grant Co. v. Owens*, 141 S.E. 860, 865 (Va. 1928); *Doe v.*

*Siddig*, 810 F. Supp. 2d 127, 137 (D.C. 2011) ("Under Virginia law . . . it is sufficient that the defendant used 'force, words, or acts' of which the plaintiff was 'afraid to ignore or to which [she] reasonably believe[d] [she] must submit.'").

Calloway's final claim is an intentional infliction of emotional distress claim, which is "not favored" under Virginia law. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 269 (4th Cir. 2001) (quoting *Bowles v. May*, 166 S.E. 550, 555 (Va. 1932)). To establish this claim, Calloway must prove, by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless," (2) "the conduct is outrageous and intolerable," (3) "the alleged wrongful conduct and emotional distress are causally connected," and (4) "the distress is severe." *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (*citing Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)).

Defendants raise a number of separate grounds for dismissal as to these intentional torts. First, as to the assault and false imprisonment claims, defendants urge this court to conclude that the allegations of her complaint show that Calloway consented to the search, by virtue of her signature on the consent form. For the same reason, defendants urge dismissal of the individual-capacity § 1983 claims. In particular, defendants note that Calloway admits that she signed the consent form prior to the search, and they assert that her allegations themselves show that she had a "choice" in that she could either consent to the search or be barred from all future visitation.

The court will not dismiss the intentional tort claims on this basis. A careful review of the complaint shows that Calloway has plausibly alleged that her consent was not voluntarily given. While facts learned in discovery may ultimately prove otherwise, Calloway has alleged that she felt pressured and forced to sign the form, and has stated sufficient facts to plausibly

state a claim of both assault and false imprisonment and to proceed with her § 1983 claims against the individual defendants.

Defendants also seek dismissal of Calloway's assault claim on the grounds that she has not set forth allegations of conduct by defendants "intended to place the victim in fear of bodily harm." Again, the court disagrees. While it is impossible to know the intent of any of the officers, Calloway alleges that the two officers conducting the strip search in fact touched Calloway's body and hair, and she stood in front of them naked while they otherwise directed her actions. The court concludes that these allegations plausibly state a claim for assault.[5]

Defendants next seek dismissal of the false imprisonment claim on the grounds that Calloway was "free to leave." (Defs.' Mem. Supp. Mot. to Dism. 13, Dkt. No. 13.) It is true that Calloway alleges that she was informed she could either consent to the search or leave the facility. But Calloway's leaving the facility was conditioned on her never being permitted to visit again. Also, she alleges that she was concerned she would be arrested if she did not consent. In a similar case, where contract employees at a jail were told they could either consent to a strip search or be barred from future employment, the court allowed a false imprisonment claim to go forward, noting that "[c]laims for battery and false imprisonment under Virginia law frequently rise and fall with the reasonableness of the arrest/search underlying such claims." *Vollette v. Watson*, 937 F. Supp. 2d 706, 725–26 (E.D. Va. 2013). Indeed, because false imprisonment requires that there was no adequate legal justification for the detention, the false imprisonment claim necessarily implicates whether the search was reasonable or unreasonable.

---

[5] With the exception of the arguments as to Woodson, defendants' motion does not distinguish between the individual defendants. The brief does state—in two sentences buried in a discussion of plaintiff's constitutional claims—that "the named defendants were not the actual officers who conducted the search [and] cannot be held to have unlawfully conducted a search that they did not personally conduct," (Defs.' Mem. Supp. Mot. Dismiss 12), but it offers no other argument or authority to support that any individual defendant should be dismissed as to any specific tort claims. Given this failure, the court does not address at this time whether the officers who required the search, but did not participate in it, can nonetheless be held liable for assault, false imprisonment, or intentional infliction of emotional distress.

At this stage, and as already discussed, Calloway has alleged sufficient facts showing that the search was unreasonable.

Defendants also argue that the intentional infliction of emotional distress claim fails because: (1) plaintiff does not allege severe emotional distress, but simply states that she was confused and frightened; and (2) because there are insufficient allegations that defendants' conduct was intentional, reckless, outrageous, or intolerable. As to the first assertion, the court concludes that the allegations in the complaint plausibly state a claim that she suffered severe emotional distress. Specifically, Calloway alleges that she suffered "severe emotional distress, anxiety and post-traumatic stress, degradation, humiliation and embarrassment, sleeplessness, fear of corrections officers and law enforcement officers, fear of arrest and involuntary confinement, [and] violation of her body and dignity . . . ."

Some courts have relied heavily on *Russo*, and its focus on an "objective physical injury caused by the stress, . . . medical attention, . . . confine[ment] at home or in a hospital, or . . . lost income," 400 S.E.2d at 163, in order to dismiss claims for intentional infliction of emotional distress that do not meet that standard. *See, e.g.*, *Johnson v. City of Richmond*, No. 3:04-cv-340, 2005 WL 1668080, at *14–15 (E.D. Va. June 16, 2005). But the Fourth Circuit "has explicitly stated that Fed. R. Civ. P. 8 trumps Virginia's heightened pleading standards for intentional infliction of emotional distress in federal cases governed by state law." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 758 (E.D. Va. 2016) (citing *Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005)). The *Hatfill* court denied a 12(b)(6) motion to dismiss, even though the plaintiff only alleged "severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury." 416 F.3d at 337. Since *Hatfill*, federal courts applying Virginia law have allowed less specific allegations of emotional distress to survive motions to dismiss. *See, e.g.*, *Daniczek*, 156 F. Supp.

3d at 759 (finding pleading sufficient when alleging "financial harm, harm to her professional reputation, stress, clinical anxiety and depression, mood swings, and insomnia"); *Williams v. Agency, Inc.*, 997 F. Supp. 2d 409, 415 (E.D. Va. 2014) ("Plaintiffs' allegations of 'severe emotional distress' and paranoia are sufficient . . . ."). As a result, "[r]elatively simple allegations of emotional distress are sufficient to meet this requirement" as long as the alleged distress is still severe. *Williams*, 997 F. Supp. 2d at 415.

Because the Fourth Circuit has applied the federal pleading standard of Rule 8, rather than the stricter Virginia standard, this court concludes that Calloway's alleged symptoms, which include allegations of both physical and mental symptoms as a result of the defendants' actions, are sufficient to state a plausible intentional infliction of emotional distress claim.

As to defendants' assertion that plaintiff has not pleaded that their conduct was outrageous, the court disagrees. Defendants contend that "the search was conducted under reasonable suspicion, in accordance with protocol, and with [her] consent." (Defs.' Mem. Supp. Mot. Dismiss 15.) This is a mischaracterization of plaintiff's complaint, particularly because the court must treat as true the allegations of the complaint. Treating those allegations as true, the complaint alleges that, without reasonable suspicion—or any reason at all—and with recorded evidence in their possession showing nothing improper occurred, defendants subjected Calloway to a demeaning and humiliating strip search without her voluntary consent. The court concludes that those allegations are sufficient to state a plausible claim of "outrageous" conduct under Virginia law.

Accordingly, as to these state claims brought against the defendants, the court will deny the motion to dismiss.[6]

## H. The Claims Against Defendant Woodson Will Be Dismissed.

Defendants also seek dismissal of all claims against Woodson, and the court agrees that they are subject to dismissal. As to the § 1983 claim, there is no respondeat superior liability under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Instead, to be liable, a defendant must have "acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1997). There are no allegations in Calloway's complaint that Woodson played any direct role or was personally involved in her strip search, or in the events preceding and following it. Indeed, Calloway alleges that she was told Woodson was not present at the ACC on that day. Regardless of whether he was there or not, though, she has not alleged that he participated in any of the events, spoke with her, directed or ordered the search, or even that he was consulted concerning what steps or actions should be taken as to her.

A claim may be brought against a supervisor where his own indifference or authorization causes a constitutional injury. *Slaken v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985). In order to state a claim against a supervisor under this theory, a plaintiff must allege: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's

---

[6] The court's ruling does not apply to defendant Woodson. As the court discusses separately, Calloway has not sufficiently alleged any personal involvement on the part of Woodson, and so the claims against him may not proceed.

inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Calloway fails to allege facts sufficient to support the required elements for supervisory liability against Woodson. Thus, the § 1983 claims against him must be dismissed.

For like reasons, the state law claims against Woodson also must be dismissed. Again, there are no allegations in the complaint that he was personally involved in any of the events giving rise to the tort claims. Furthermore, to the extent Calloway is seeking to hold Woodson liable under a respondeat superior theory, that theory only allows an *employer* to be held liable for the tortious acts of its employee if the employee was performing the employer's business and acting within the scope of his employment. *Plummer v. Center Psychiatrists, Ltd.*, 476 S.E.2d 172, 173–74 (Va. 1996). The employer of the individual defendants is the Commonwealth of Virginia, not Woodson. Thus, no respondeat superior liability can be imposed on him.

## IV. CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part defendants' motion to dismiss. All claims against the Commonwealth will be dismissed, and all claims against defendant Woodson will be dismissed without prejudice. Both of these defendants, therefore, will be dismissed entirely. Any VTCA claim, the Virginia constitutional claims, the claim under Virginia Code § 19.2-59.1, and all state claims for negligence will be dismissed. Additionally, the § 1983 claims against individual defendants in their official capacities will be dismissed.

Thus, the court's ruling will allow only the following claims to proceed:

(1) the 42 U.S.C. § 1983 claims alleging violations of the Fourth and Fourteenth Amendments (Causes of Action One and Two) against all of the individual defendants in their individual capacities, with the exception of defendant Woodson; and

(2) the intentional tort claims of false imprisonment, assault, and intentional infliction of

emotional distress against all of the individual defendants, with the exception of

defendant Woodson.

An appropriate order will follow.

Entered: September 20, 2017.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge