CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/10/2018

JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

ANGELA CALLOWAY,                    )
                                    )
        Plaintiff,                  )
                                    )        Civil Action No. 5:16-cv-00081
    v.                              )
                                    )        By: Elizabeth K. Dillon
JEFFREY L. BROWN, *et al.*,         )            United States District Judge
                                    )
        Defendants.                 )

**MEMORANDUM OPINION**

Plaintiff Angela Calloway was strip searched during the course of visiting an inmate at

the Augusta Corrections Center (ACC), a facility run by the Virginia Department of Corrections

(VDOC).  Although she signed a written form beforehand consenting to the search, she alleges

that her consent was not voluntary.  She further argues that the search was not supported by

reasonable suspicion and thus that it violated her rights under the Fourth Amendment.  Some of

the claims in her original complaint were dismissed by the court's prior ruling on defendants'

motion to dismiss.  Calloway has since filed an amended complaint, which omits the dismissed

claims and names some individuals previously identified only as Doe defendants.

Pending before the court and addressed herein is defendants' motion for summary

judgment, in which all defendants seek summary judgment on all of Calloway's claims, on

various grounds.  The motion is fully briefed and was argued before the court.  The court agrees

that summary judgment is appropriate for several reasons, all of which are discussed herein.

Primarily, the undisputed facts establish that the search was justified because it was supported by

reasonable suspicion.  Thus, regardless of the voluntariness of Calloway's consent, defendants

cannot be held liable for their respective roles in conducting that search.  Accordingly, the court

will grant defendants' motion for summary judgment.

The strip search at issue occurred on Sunday, July 17, 2016, when Calloway went to ACC to visit offender Travis Talbert.  Her amended complaint names seven individual ACC employees who were involved in varying degrees in the incident.  By agreement, Defendant Nicholas Shires has been dismissed from the lawsuit based on his lack of involvement in the events.  The remaining defendants are Jeremy Nelson, Benjamin Lokey, Jeffrey Brown (JBrown), Edward Hoskie, Heidi Brown (HBrown), and Heather Hale.  The court describes their involvement briefly.

Nelson observed Calloway and Talbert over a live video feed during their visit and reported to Lokey what he believed to be suspicious actions by them both.  Lokey is an Institutional Investigator for ACC.  Lokey had information before that day that caused him to direct Nelson to watch Talbert and any of his visitors carefully.  Jointly, he and JBrown, who was serving that day as the Administrative Duty Officer at ACC, made the decision to interrupt the visit and seek Calloway's consent for the search.  Hoskie was at pertinent times a Lieutenant at ACC.  He was in the control room with Nelson and spoke to Calloway after the strip search.  HBrown is a Sergeant at ACC.  She observed Calloway when she arrived at ACC and reported her as appearing nervous.  HBrown also was one of two female officers who conducted the search and is the officer who Calloway alleges touched her hair.  Hale is a Correctional Officer at ACC.  She was the second female officer who conducted the search.  She also was present in the visitation room.

In the week preceding Calloway's visit, Lokey had heard statements from other inmates that a "Travis" was "moving," which is prison slang for smuggling contraband.  Lokey also knew that Talbert had received disciplinary charges at his prior place of incarceration, Bland Correctional Center, arising from a February 2016 attempt to smuggle contraband into that

2

facility.  Specifically, Talbert was convicted of a disciplinary charge, pursuant to his plea, that arose from his conspiring with another inmate and with two individuals outside the prison to bring contraband (tobacco) into the facility.[1]  Before he left for the weekend, Lokey told Nelson that if Talbert had a visitor to keep an extra close watch on them since Talbert may be "moving."

Although there was no specific information prior to her visit that Calloway herself was likely to be smuggling anything into ACC, several defendants stated in their affidavits that curbing the flow of drugs and contraband into the facility is an important security goal and that visitors are sometimes the source of the contraband and pass it to offenders during visitation.  As noted by defendants Lokey and Brown, visitors have been found to conceal drugs in various places on their bodies, including the mouth, anus, vagina, and armpit, as well as in the linings of clothing, in their underwear, in their hair, and in their crotch area.  (Lokey Aff. ¶ 5, Dkt. No. 64-7; JBrown Aff. ¶ 11, Dkt. No. 64-3.)  Additionally, Nelson had been very successful in the past in identifying and reporting suspicious movements, which reports had led to the interception of drugs or other contraband.  (Lokey Aff. ¶ 6.)

Calloway, who was on the approved visitor list and had already undergone a background check to obtain her approved status, had visited ACC once before without incident.  On July 17, 2016, she went through the requisite security procedures that all visitors entering ACC must undergo.  The screening upon arrival included her placing her jacket and shoes in a container for inspection, going through a metal detector, and undergoing an entire body "pat down" by a female officer for weapons or contraband, which was conducted—Calloway thinks—by HBrown.  (Calloway Dep. 26, Dkt. No. 64-9.)

---

[1]  The incident at Bland did not involve visitors passing contraband at visitation; instead, the outside persons were to leave the contraband at a specified location outside the facility and an inmate on work detail was to pick it up and bring it back inside.

HBrown testified that she recalled Calloway looking "frazzled and nervous" when she arrived. (HBrown Dep. 34, Dkt. No. 66-17.) She reported this to Nelson when she notified him that Talbert had a visitor coming to the visitation room. Nelson also personally observed Calloway looking nervous when he checked Calloway's identification after the prescreening. (Nelson Dep. 25, Dkt. No. 64-8; Nelson Aff. ¶ 5, Dkt. No. 64-5.)

Calloway does not deny that both HBrown and Nelson reported she was acting nervous, but she offers several reasons why this might have been so. For example, she had just finished a long ride and was anxious to use the restroom, and her screening was different than the first time she visited. (Pl.'s Opp'n 3, Dkt. No. 66.) In particular, Calloway was told when she first arrived that she was not allowed to wear her sunglasses and the clothing that she wore on her last visit, so she had to go back out and get her jacket. Also, she had brought Talbert's son (and his mother) with her and tried to bring the son into ACC, but she was not permitted to do so, even though she did the first time she had visited. (Calloway Aff. ¶¶ 5–11, Dkt. No. 66-1.)

As a Master Control Officer, Nelson was tasked with monitoring the camera system at ACC and, on the weekends during visitation, specifically watching offenders with their visitors. Nelson's primary job was to watch for activity of visitors that might be suspicious, including excessive nervousness, movements between offenders and visitors, dropping motions, and adjustments of clothing. (Nelson Aff. ¶ 4.) As noted, Nelson had a history of successfully identifying suspicious behavior that led to the interception of contraband. (Lokey Aff. ¶ 6.)

At all pertinent times during Calloway's visitation, Nelson was monitoring the direct video feed of the visitation room. There was also a Rapid Eye recording system recording images of the visitation room. According to Nelson, the Rapid Eye recording is not a continuous recording, like the live feed, but instead records approximately 5 frames per second (one video

4

frame every 0.2 second). The result is a choppy video, but it does not contain big gaps of time. The video of the visitation is part of the summary judgment record, and the court has viewed it.

Nelson's affidavit explains in detail what he observed that caused him to be suspicious of Calloway and Talbert. For example, Talbert seemed to be frequently looking out for the correctional officers as they made their rounds. (Nelson Aff. ¶ 5.) Additionally, Nelson's affidavit states that he observed that Calloway "fidgeted with her waistband on several occasions" and that "there was at least one time when it looked like she reached inside the front of her pants." (*Id.*) Calloway also adjusted her clothing several times, which could be an indication that contraband is being moved from one part of the body or clothing to another place for easier retrieval. (*Id.*) Nelson called Lokey and reported his suspicions, although the record is unclear as to exactly what was relayed.

In his deposition, Nelson said he told Lokey that he thought that Calloway had unbuttoned the front of her pants, which he identified as occurring at 1:30:25 on the Rapid Eye recording. (Nelson Dep. 122, 134–36.) Lokey's affidavit states that Nelson told him he had seen suspicious "hand movements," including "what looked to be digging in the front of her waistband." (Lokey Aff. ¶ 6.) In the internal incident report completed by HBrown, she states that she was informed that Calloway "was viewed to be reaching into her front waistband and around her waist area while in the visiting room." (Dkt. No. 68.) HBrown also testified that Nelson told her he had noticed a female was "messing around near her abdomen, pants area." (HBrown Dep. 43.) In her affidavit, Calloway states that Lokey told her they captured her on camera trying to unbutton her pants. (Calloway Aff. ¶ 26.)

Lokey contacted JBrown and, after they discussed Nelson's report, they decided that the visit between Talbert and Calloway should be terminated, that Talbert should be taken back and searched, and that Calloway should also be strip searched, if they could get her consent.[2]

At his deposition, Nelson admitted that the REM video did not appear to show her unbuttoning her pants, but Nelson testified that "[i]n realtime, it was more difficult to tell, and that's what it appeared to me." (Nelson Dep. 122–23.) In his deposition, he also stated that at 1:30:22 through 1:30:25, it appeared to him that Calloway was pulling on her waistband and that her hand was not entirely visible the whole time. He pointed out that he could "clearly see . . . the front of [her] pants move forward." (*Id.* at 135.)

Calloway denies that the video evidences plaintiff "messing with her pants," "reaching into her pants," "fidgeting with her waistband" or "unbuttoning her pants." (Pl.'s Opp'n 4.) But the only evidence she points to in order to support her denial is Nelson's deposition at page 138 and the Rapid Eye recording. (*Id.*) Upon close inspection, however, neither Nelson's testimony nor the recording refute that she engaged in suspicious activity; instead, they support Nelson.

As for Nelson's supposed admission, he in fact affirmed in his deposition that he saw her pulling on her waistband, as noted above, and he also pointed out her other suspicious behavior. While he admitted that the Rapid Eye footage did not seem to show her unbuttoning her pants, he reaffirmed that the footage did not change his views of what he saw in real time. (Nelson Dep.

---

[2]  In their affidavits, Lokey and Brown stated that they decided Calloway would be approached to see "if she would be willing to be interviewed about the events in the visitation room." (Lokey Aff. ¶ 6; JBrown Aff. ¶ 4.) Calloway points out, however, that the female officers were summoned for the strip search before Lokey and Brown even spoke with her. Based on this, she argues that the decision had already been made to strip search her at the time the visit was stopped, regardless of her consent. Thus, viewing the evidence most favorably to Calloway, the decision had been made to do more than interview her. Lokey and Brown clearly intended to seek—and did seek— her consent for a strip search. Due to Calloway's own admissions, however, the evidence does not support that they would have strip searched her without obtaining her signature on the consent form. Specifically, she testified that she knew the consequence of not consenting was that she would not be able to visit again. (Calloway Aff. ¶ 30 (stating Lokey told her that if she did not consent to the search, she would not be able to come back to the facility to visit"); *id.* at ¶ 33 (explaining she signed the consent form because she "was afraid [she] would be denied future visitation" if she did not); Calloway Dep. 21–22.)

138.) And he affirmed that he made his report to Lokey in good faith. (*Id.*) Moreover, his affidavit explains in detail what he observed that caused him to be suspicious, as do defendants' Answers to Interrogatories. (Nelson Aff. ¶ 5; Defs.' Resp. to Pl.'s Second Set of Ints. 1–2, Dkt. No. 66-9.)[3]

With regard to the video, the court has reviewed it in its entirety, with a focus on the times set forth in the interrogatory answers. Most of the video reflects largely innocuous behavior. Calloway and Talbert are talking with each other and laughing, she gets him something to eat and later gets herself something to eat.[4] But there are several times where Calloway's hands were in and near the waistband of her pants, and for two of those, it is hard to tell whether she is unbuttoning her pants or merely adjusting her pants where a button would be. In particular, the Rapid -Eye Recording at time stamps 12:33:15, 12:39:54, and 1:30:22 reflect these behaviors. At another point, her hand is inside her jacket or sweater, but at her waist. (*See* Rapid-Eye Recording at 1:22:40.) There are also other times when she pulls on or adjusts her jacket or sweater or portions of it. Thus, Nelson's report about her activity was largely accurate. Taking into account that he was watching the live feed in realtime and that he did not have the capability to rewind it or slow it down, there is nothing in the record that supports any assertion that Nelson made up the conduct that he reported to Lokey. Instead, his report—with the possible exception of confirming the unbuttoning—is actually confirmed by the video. Indeed, it

---

[3] Calloway also points out—correctly—that when Nelson was shown the video during his deposition, he admitted that there were other visitors engaging in suspicious or inappropriate behavior numerous times and that he did not notice that behavior or report it to anyone. (Nelson Dep. 49, 74–75, 91, 97–98, 104.) But that does not negate the reasonable suspicion based on Calloway's actions. Nelson testified—and Calloway has not disputed—that he did not notice those behaviors by other visitors because he had not received any specific instructions to closely monitor the visits of other offenders, like Lokey had instructed him to do with Talbert. (*Id.* at 104; Nelson Aff. ¶ 5.) Thus, Nelson had a valid, undisputed reason for focusing on Talbert and Calloway to the exclusion of others in the same room.

[4] There are also two times shortly before the visit is terminated where Talbert gets up and kisses Calloway, which is not permitted, and then appears to look around to make sure they were not seen.

7

seems to the court that Calloway does not dispute her recorded behavior, but rather Nelson's interpretation of the behavior.

In any event, after Lokey and Brown decided to stop the visit, officers came in and separated Calloway and Talbert and some of the officers took Talbert back to be strip searched. Calloway was escorted from the visitation room by Lokey and Brown and taken to a private office. When asked, Calloway denied trying to smuggle in any contraband, denied "messing with" her pants, and was upset and crying over the incident as they spoke to her. Although the court is not ruling on the voluntariness of her consent,[5] it is undisputed that Calloway signed a written consent form agreeing to be strip searched and that she at no point after signing made any attempt to revoke that consent, either through her words or her actions.

It is also undisputed that HBown and Hale played no role in the decision to search Calloway, nor were they present when Calloway was asked for and gave her consent. It is further undisputed that they were both told that Calloway had consented and signed a written consent form.

Initially, the two female officers planned to perform the search in a private office. After Calloway told them she was having her period and had a tampon in, the decision was made to search her in the women's bathroom. One of the guards stood by the door into the bathroom, which could not be locked. According to HBrown and Hale, this was done to block others from entering. Calloway asserts it was done to keep her inside, although she offers no evidence for this.

Calloway was then strip searched. The search is described in her affidavit and in HBrown's deposition. (Calloway Aff. ¶¶ 36–42; HBrown Dep. at 68–69.) During the

---

[5] The court has omitted a number of facts regarding the interview of Calloway, as well as a number of facts that bear on the voluntariness of her consent, because they are not germane to the court's discussion.

procedure, she was required to take each piece of clothing off as directed and hand it to HBrown, who would then hand it to Hale to search it. After she had completely disrobed, she also was asked to raise her arms, lift her breasts, open her mouth, and shake and pass her hands through her hair. She also was required to squat, spread her buttocks and cough forcefully several times in front of them. Before doing so, she went into a stall and took out her tampon, placing it on a paper towel to give to HBrown, who inspected it and then threw it away. After Calloway had run her own hands through her hair, Calloway alleges that HBrown passed her hands through Calloway's hair. (Calloway Dep. 25.) HBrown denies that occurred, but it is undisputed that the two female officers did not otherwise touch Calloway. Calloway never told either Correctional Officer that she wanted them to stop the search, nor did she ever express to Hale or HBrown that she wanted to leave. (Calloway Dep. 30.)

No contraband was found on Calloway or Talbert. Afterward, Calloway was permitted to get dressed and was offered a replacement tampon several times, which she refused. According to Calloway, Lokey apologized to her for having to go through the strip search and offered to permit her to resume visitation and to extend the visitation by thirty minutes. She returned to the visitation room and resumed her visitation with Talbert. Thereafter, she never returned to the ACC and testified in her deposition about how the incident has affected her, especially emotionally.

She alleges that, after she had resumed her visit, Edward Hoskie came up to her and began to apologize and "tried to explain that when people think they see something but they didn't really see something, but they make their own assumption of it, that is what happened here, and that's how this all came about." (Calloway Aff. ¶ 51.)

Based on the foregoing facts, Calloway asserts the following claims against all remaining defendants:

1. A claim pursuant to 42 U.S.C. § 1983 alleging that the illegal search violated her rights under the Fourth and Fourteenth Amendments ("Fourth Amendment claim");
2. A claim pursuant to 42 U.S.C. § 1983 alleging that defendants violated her due process rights under the Fifth and Fourteenth Amendments ("Fifth Amendment claim");
3. Assault;
4. False imprisonment; and
5. Intentional infliction of emotional distress.

(*See generally* Am. Compl., Dkt. No. 44.)

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).  Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a

10

reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.3d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

**B.    Claims Against Defendant Hoskie**

The court first notes that defendant Hoskie is entitled to summary judgment on the ground that he lacked any actionable personal involvement in the events involving Calloway. To hold an individual liable under a § 1983 claim, the defendant must have "acted personally in the deprivation of the plaintiff's rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1997). Calloway points to no evidence, however, showing Hoskie's personal involvement. Calloway testified that, after the search had occurred and she had resumed visitation, Hoskie approached her. He apologized for what happened and "tried to explain that when people think they see something but they didn't really see something, but they make their own assumption of it, that is what happened here, and that's how this all came about. He said that someone saw something and they made more of it but didn't know what to think but took their own opinion of what they thought." (Calloway Aff. ¶ 51.)

Calloway argues that, because Hoskie was present in the control room with Nelson, he "was in a position to alter the events" and that "if he had spoken up honestly and unambiguously in a timely manner (instead of waiting until the search had been completed to report to Plaintiff his own apparent doubts and misgivings about the lack of reasonable suspicion . . .)," he could have prevented the strip search. (Pl.'s Opp'n 23.) This argument lacks merit.

As an initial matter, Calloway points to no authority saying that an officer in the presence of a second officer reporting something the second officer has observed has an obligation to question that report. More importantly, however, nothing in the record supports the assertion that Hoskie believed—at the time Nelson was making his report to Lokey—that the report was incorrect. Hoskie's "explanation" to Calloway, after the search had revealed no contraband, does

not even come close to being a statement that he disagreed that there was reasonable suspicion before the search. Instead, the only admissible evidence about what Hoskie knew or did not know comes from Hoskie and Nelson.

Hoskie avers that he "did not observe Ms. Calloway or offender Talbert prior to the decision being made to interrupt the visit and search the offender and speak to the visitor" and that he "did not take part in the decision" to stop the visit. (Hoskie Aff. ¶ 5, Dkt. No. 64-1.) Similarly, Nelson testified that Hoskie was monitoring the doors and opening doors from the control room, "because [Hoskie] said that he does not know how to use the camera system." (Nelson Dep. 24.) Although Nelson said he would point out to Hoskie when he saw or noticed something, the only time he recalled doing so during that day was when he pointed out to Hoskie that Talbert's visitor had arrived. (*Id.* at 25.) Thus, not only is there no evidence of Hoskie's personal involvement in the events at issue, but there is simply no evidence to support that Hoskie disagreed with Nelson's initial report or the decision to seek Calloway's consent for a search.

Hoskie is entitled to summary judgment as to all of Calloway's claims due to his lack of involvement, as well as for the reasons the court discusses relevant to all defendants.

## C.    Fifth Amendment Claim

The second claim in Calloway's amended complaint is a claim that the events constituted a violation of her right to due process. Her complaint references both the Fifth and Fourteenth Amendments as the basis for this claim. As defendants correctly note, the Fifth Amendment—applicable only to the actions of the federal government—is not applicable to these individuals, who are state actors. *See Schweiker v. Wilson*, 450 U.S. 221, 227 n.6 (1981).

Although Calloway also references the Fourteenth Amendment, that does not save her claim.[6]

While Calloway's claim is couched as either a procedural or substantive due process claim, the

Supreme Court has explained that "if a constitutional claim is covered by a specific

constitutional provision, such as the Fourth . . . Amendment, the claim must be analyzed under

the standard appropriate to that specific provision, not under the rubric of substantive due

process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997)).  The claim here falls squarely

within the Fourth Amendment's proscription against unreasonable searches and seizures and

should be analyzed in that context.  The court will grant summary judgment in defendants'

favor as to the Fifth Amendment claim.

**D.     Fourth Amendment Claim[7]**

As noted, defendants' primary argument as to the Fourth Amendment claim is that there

was reasonable suspicion to conduct the search, and thus it does not matter if Calloway's consent

was invalid.  In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court held that officers must

have some justification for a jail strip search under the Fourth Amendment.  The Court instructed

courts faced with determining whether a jail strip search was unreasonable to "consider the scope

of the particular intrusion, the manner in which it is conducted, the justification for initiating it,

and the place in which it is conducted."  441 U.S. at 559.

In the Fourth Circuit and elsewhere, courts have held that a strip search at a prison

violates the Fourth Amendment if it is not supported at least by reasonable suspicion.  *United*

---

[6]  The Fourteenth Amendment's Due Process Clause protects *portions* of the Fifth Amendment against abridgement by the states.  *See, e.g.*, *Malloy v. Hogan*, 378 U.S. 1, 6 (1962) (holding that the Fifth Amendment's prohibition against "compulsory self-incrimination is . . . protected by the Fourteenth Amendment against abridgment by the States").  It also can result in the imposition of liability under narrow circumstances not present here.  *See Doe v. Rosa*, 795 F.3d 429, 438–39 (4th Cir. 2015) (discussing the state custody exception and the state-created danger doctrine).

[7]  Because the court resolves this claim on the grounds that the search was supported by reasonable suspicion, it does not reach the issue of whether the undisputed facts establish voluntary and knowing consent.

13

*States v. Johnson*, 27 F.3d 564, 1994 WL 273899, at *2 (4th Cir. June 22, 1994) (unpublished table disposition). ("A reasonable suspicion standard applies to strip searches of prison visitors."). *See also O'Con v. Katavich*, No. 1:13-cv-1321, 2013 WL 6185212, at *5 (E.D. Cal. Nov. 26, 2013) ("Many other Courts of Appeals have concluded that, after weighing the state's legitimate interest in prison security against the privacy rights of prison visitors, a visitor may only be subjected to a strip search if the search is supported by reasonable suspicion. *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir. 1985); *Varrone v. Bilotti,* 123 F.3d 75 (2d Cir. 1997); *United States v. Johnson,* 27 F.3d 564 (4th Cir. 1994); *Spear v. Sowders,* 71 F.3d 626, 630 (6th Cir. 1995) (en banc); *Burgess v. Lowery,* 201 F.3d 942 (7th Cir. 2000); *Thorne v. Jones,* 765 F.2d 1270, 1276–77 (5th Cir. 1985); *Boren v. Deland,* 958 F.2d 987 (10th Cir. 1992); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir. 1982) . . . .").

In *Leverette v. Bell*, 247 F.3d 160, 168 (4th Cir. 2001), the Fourth Circuit applied the same standard to invasive searches of jail employees or contractors. There, too, the court concluded that the Fourth Amendment requires that prison authorities "possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person" before conducting a visual cavity search. *Id.*; *see also Vollette v. Watson*, 978 F. Supp. 2d 572, 579 (E.D. Va. 2013) (holding that a prison "standard strip search" of jail employees or contractors, requiring the person to remove all clothing and to "squat and cough" to expel contraband, must be supported at least by reasonable suspicion to comport with the Fourth Amendment). Consistent with this overwhelming authority, the parties agree that if "reasonable suspicion" existed for the search here, then there was no Fourth Amendment violation.

Pursuant to *Bell*, the court must balance the government's "need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. Here, of course, the particular search was done as part of VDOC's attempts to stop the flow of contraband

into its facilities. The smuggling of contraband is a significant problem that can cause serious security and health concerns for inmates, as the evidence shows. Indeed, the need to keep contraband out of ACC is not disputed by Calloway,

The court also must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* The court turns first to the justification factor and addresses whether there was "reasonable suspicion," but will then discuss how all the *Bell* factors support the conclusion that the search here was reasonable as a matter of law.

According to defendants, the "reasonable suspicion" supporting the strip search of Calloway was based on a number of facts: (1) a recent history of Talbert attempting to smuggle tobacco into his last place of incarceration; (2) a tip to Lokey that an offender named "Travis" was "moving"; (3) Calloway's demeanor, which at least two employees noted as being nervous upon her arrival; (4) Talbert's apparent furtive glances at correctional officers during visitation; and (5) Calloway's clothing adjustments, including messing with her waistband.

Calloway points to several facts that she says support her assertion that reasonable suspicion was lacking. First, in addition to her contention that the video does not show what Nelson thought—a point the court has already addressed—she points out that, although Hale was present in the visitation room and could personally observe Calloway's behavior, Hale did not observe any inappropriate conduct. But the fact that Hale did not see anything does not mean that Nelson did not. Nelson was viewing the visitation room from a different angle and could watch continuously. At times, Hale's view of Talbert and Calloway was blocked. Indeed, Hale testified that Calloway and Talbert were at the far end of the visitation room and Calloway had her back to Hale and where Hale's desk was. (Hale Dep. 13–14, 25, Dkt. No. 66-19.)

15

Second, Calloway also argues about alternative actions to a strip search that could have been taken to dispel any reasonable suspicion. She relies on two sets of facts for this theory. First, she argues that there was a K-9 dog available that was capable of detecting contraband. Second, she points to the undisputed evidence that Lokey had access in his office to the video feed that Nelson had watched, and that Lokey could have stopped the video feed and reversed it for purposes of reviewing what Nelson had seen. Thus, he could have reviewed the tape himself to see that she did not unbutton her pants, and he could have shown Calloway this evidence, as she had requested.

As for using the K-9 dog, defendants were not required to exhaust every possible option for determining whether a person is attempting to smuggle contraband before asking for consent to search. Moreover, there is no evidence in the record that the dog was at ACC that day; the only evidence as to the dog's availability was that the K-9 unit was rotated throughout a number of difference facilities. (Miller Dep. 50, Dkt. No. 69-3; HBrown Dep. 52.)

With regard to Nelson's report, the other officers were entitled to rely on it, especially absent any reason to question it. *Cf. United States v. Ramos-Cruz*, 667 F.3d 487, 502 (4th Cir. 2012) ("Observations of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant." (citation omitted)). Moreover, as already noted, the Rapid Eye recording shows her hands near or in her waistband. And while the live video feed may not have shown her unbuttoning her pants, it does confirm that her hands are at her waistband and possibly inside the band of her pants. There is nothing in the record—aside from Calloway's denials, which are likely typical from any visitor accused of smuggling contraband—that would have caused any other officer to doubt Nelson's report of Calloway's conduct. Thus, her arguments about other possible approaches are unavailing.

16

Calloway's contention that reasonable suspicion did not exist relies substantially on a Sixth Circuit case, *Daugherty v. Campbell*, 33 F.3d 554 (6th Cir. 1994).[8]  In that case, the court held that a visual body cavity search of a prison visitor as a condition to visiting with her inmate husband was not supported by reasonable suspicion and therefore violated the Fourth Amendment.  The court noted that the evidence relied upon by the warden to justify the search was "solely" a report from a corrections officer that the plaintiff was concealing drugs on her person and smuggling them into the facility, although that officer had no recollection of ever giving such a report.  *Id.* at 555 & n.1.  The court reasoned that a "[g]eneralized suspicion of smuggling activity" or an uncorroborated tip from an officer (without anything else linked to "objective facts" known by the authorities) was insufficient to establish reasonable suspicion.  *Id.* at 556–57.  This was particularly true in light of "readily accessible information [that] discredited the tip."  *Id.* at 557.  This included that the wife had visited frequently over a two-year period, she was "very familiar" to officers, and she had never been suspected of smuggling activity.  *Id.*  The court also found it significant that her husband "had never been caught with drugs or been involved in drug related activities" at the facility.  *Id.*  Under those facts, the officer's tip was insufficient to establish reasonable suspicion for a search.  The court emphasized that it was "not impos[ing] a duty on wardens to investigate the reliability of all their officers' conclusions," but that there must be some "independent objective information" to support the reliability of the officer's conclusions.  *Id.*

Calloway contends that the situation here is like *Daugherty* and that all defendants had here was an uncorroborated "tip" from an inmate to Lokey about a "Travis" smuggling.  She also describes Nelson's report as an uncorroborated tip, much like the "uncorroborated" tip from the

---

[8]  In an earlier decision in the same case addressing only the issue of qualified immunity, the Sixth Circuit's description of different types of searches suggested that the search at issue in that case was more invasive than a typical "strip search" in that it involved a visual inspection of a naked individual that includes visual inspection of the anal and genital areas.  *Daugherty v. Campbell*, 935 F.2d 780, 781 n.1 (6th Cir. 1991).

officer in *Daugherty*.  She claims that defendants failed to observe or possess any evidence of an intent to smuggle by Calloway, other than Nelson's report and nothing more than a hunch about Talbert.

This case is readily distinguishable from *Daugherty*.  The very facts that were lacking in *Daugherty* and could have been "independent objective information" to support the tip there, are present here.  For example, whereas the inmate being visited in *Daugherty* had no prior problems, Talbert had been found guilty of a disciplinary charge involving smuggling contraband less than six months earlier, a fact known to Lokey.  Additionally, this was only Calloway's second visit, so there was not a lengthy, two-year history of visits by the same visitor without incident, as in *Daugherty*.  Moreover, to accept Calloway's argument, the court would have to conclude that the video does not back up Nelson's report and that the other facts relied upon—her being nervous upon arrival (as reported by two officers), and Talbert's previous problem with smuggling—were insufficient, even taken together, to create reasonable suspicion.[9]

For their part, defendants rely on the Fourth Circuit's decision *Leverette v. Bell*, where the court held that a visual body cavity search of a prison employee was supported by reasonable suspicion where it was based solely on an inmate informant's tip that the employee was smuggling in marijuana inside a tampon.  247 F.3d 160, 163 (4th Cir. 2001).  The original tip here was less specific than the tip given in *Leverette*, which identified a specific person, a type of a drug, and a specific body location and method of concealment for the contraband.  But there was much more to support reasonable suspicion here than just the vague tip at issue in *Daugherty*.  Lokey and Brown also had the undisputed evidence of Calloway's nervousness upon her arrival, and, most importantly, Talbert's and her actions as seen by Nelson and reported by

---

[9]  Calloway also points out that although Nelson says he reported her "messing with her pants" at 1:30, she was not removed until 1:57, nearly thirty minutes later.  From this, she suggests that her removal was not based on Nelson's observations.  Other than the lapsed time, however, she offers no support for this theory, and all the witnesses who were involved reference Nelson's report as the basis for the decision to stop the visit.

him, which are reflected in large part on the Rapid Eye recording. Also, just as Nelson's past observations of suspicious behavior in the visitation room had led to the seizure of contraband, the anonymous tipster had provided accurate drug-related tips in the past. *See Leverette*, 247 F.3d at 163. All of these facts, taken together, are sufficient for Brown and Lokey to determine that reasonable suspicion existed to support their search. They also sought to obtain her written consent (and apparently believed they had done so) prior to conducting the search.

The court's conclusion that reasonable suspicion existed here, resulting in a constitutionally valid search, is also supported by an application of the other three *Bell* factors: "the scope of the particular intrusion, the manner in which it is conducted, . . . and the place in which it is conducted." 441 U.S. at 559.

Although a strip search may not be as invasive as other searches, such as the body cavity search at issue in *Leverette*, any strip search is obviously a significant intrusion. The mere occurrence of a strip search is an embarrassing, uncomfortable, upsetting, and potentially humiliating experience. But the manner and place of the search here support its reasonableness. Not only was the search conducted by two female officers, but it was moved from a private office to a women's bathroom in order to accommodate Calloway's personal circumstances. Aside from a brief touching of Calloway's hair (which Hale denies), the female officers did not touch her. Nor does Calloway report that they were mean, rude, or unprofessional. Thus, the undisputed facts here show that the search was carried out in a reasonable manner with significant attention given to Calloway's privacy. *See Leverette*, 247 F.3d at 168 (noting that the search "was administered in a sensitive and professional manner," where "the officials involved were all female, the search activity was conducted in a private setting, and it was handled with

19

dispatch").[10]  All of these factors lead the court to conclude that no reasonable jury could find "reasonable suspicion" lacking here.  For this reason, the court will grant summary judgment in defendants' favor as to the Fourth Amendment claim.[11]

## E.    State Law Claims

Defendants have expressly requested that the court, if granting summary judgment against both federal claims, "decline to exercise pendent jurisdiction over . . . the state law claims."  (Defs.' Mem. Supp. Mot. Summ. J. 27.)  The court has discretion to decline supplemental jurisdiction over the state law claims, and could dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(2).  In exercising its discretion, however, the court must consider factors of judicial economy, convenience, fairness, and comity.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Here, the parties have engaged in extensive discovery, and a trial date is fast approaching.  The issues concerning all claims have been fully briefed.  The

---

[10]  Not only did the search in *Leverette* involve a visual body cavity search, but the plaintiff had to wait for approximately four or five minutes, while completely naked, for a nurse to arrive.  She also had to repeatedly bend over, and bend over farther, opening her legs as far as she could at least three times so that the nurse could look in her vagina.  Despite these facts that demonstrate a more burdensome search then what Calloway endured, the court did not find the "manner" of the search problematic.

[11]  At the very least, all defendants are entitled to qualified immunity on this claim.  Qualified immunity generally involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that the defendants' conduct violated a constitutional right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If both prongs are satisfied, then qualified immunity does not apply.  *Id.*  "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense."  *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013).

Qualified immunity protects government officials "performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009).  Such an official will be protected by qualified immunity if his actions were objectively reasonable.  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  As often expressed, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citations omitted).  As stated by the United States Supreme Court in *Malley*, "if officers of reasonable competence could disagree on whether the action was reasonable, immunity should be granted."  475 U.S. at 341; *see Springmen v. Williams*, 122 F.3d 211, 214 (4th Cir. 1997).  Under this standard, all but the "plainly incompetent or those who knowingly violate the law" are protected.  *Malley*, 475 U.S. at 341.  Applying these standards to the facts here, the court concludes that each defendant here would be entitled to qualified immunity, for substantially the reasons described in defendants' briefing.  (*See generally* Defs.' Supp. Mem., Dkt. No. 64; Defs.' Reply 6–8, Dkt. No. 69.)

20

non-federal claims are clearly intertwined with the federal claims factually and legally. No purpose would be served by dismissing the state claims without prejudice. For all these reasons, the court will retain jurisdiction over the state law claims. It addresses briefly why summary judgment for defendants as to those claims is proper.[12]

### 1. Assault

Assault under Virginia law requires proof that the defendant: (1) engaged in an overt act intended to inflict bodily harm, coupled with the present ability to inflict such harm, or (2) engaged in actions intended to place the victim in fear of bodily harm, thereby creating a well-founded fear in the victim. *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2011). The only defendants that could arguably be held liable for assault here are Hale and HBrown. Given that there was a justification for the search, rendering it constitutional, and the additional undisputed fact that both Hale and HBrown believed Calloway had consented to the search, there is a complete lack of the requisite intent by them. Put differently, there is no evidence from which a jury could find that any defendant had either an *intent* to inflict bodily harm or engaged in an action *intended* to place Calloway in fear of bodily harm. Summary judgment will be granted for defendants as to this claim.

### 2. False Imprisonment

To prove false imprisonment under Virginia law, Calloway must show that her liberty was restrained without any sufficient legal excuse. *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). The restraint need not be physical; it can be caused by threats as well as by actual force, and the threats may be by conduct or by words. *W.T. Grant Co. v. Owens*, 141 S.E. 860, 865

---

[12] In addition to arguments applicable to all defendants, defendants seek summary judgment on the grounds that some of them are not proper defendants to some claims. Because the court grants summary judgment on the more general grounds, it does not address this argument.

(Va. 1928); *see Doe v. Siddig*, 810 F. Supp. 2d 127, 137 (D.C. 2011) ("Under Virginia law . . . it is sufficient that the defendant used 'force, words, or acts' of which the plaintiff was 'afraid to ignore or to which [she] reasonably believe[d] [she] must submit.'"). Here, the same reasonable suspicion that supported the search is a "sufficient legal excuse" to restrain Calloway's liberty. Accordingly, summary judgment also will be granted for defendants on this claim.

### 3. Intentional Infliction of Emotional Distress

Claims of intentional infliction of emotional distress claim are "not favored" under Virginia law. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 269 (4th Cir. 2001) (quoting *Bowles v. May*, 166 S.E. 550, 555 (Va. 1932)). To establish her claim, Calloway must prove, by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless," (2) "the conduct is outrageous and intolerable," (3) "the alleged wrongful conduct and emotional distress are causally connected," and (4) "the distress is severe." *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (*citing Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). Again, in light of the court's finding that reasonable suspicion existed, Calloway cannot prove, and certainly not by clear and convincing evidence, that any defendant engaged in outrageous and intolerable conduct either intentionally or recklessly.

### III. CONCLUSION

For the foregoing reasons, the court will grant defendants' motion for summary judgment in its entirety.

An appropriate order will follow.

Entered: September 10, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

22